IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FRED MARES and
CHARLIE GARRETT,

       Plaintiffs,

vs.                                                                          NO. CIV 97-1462 MV/DJS

VILLAGE OF MELROSE, RAY HESTER,
individually and in his official capacity as
Mayor of the Village of Melrose, and
HOYT CLIFTON, individually and in his
official capacity as Mayor Pro Tem of the
Village of Melrose,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment on

Plaintiffs' Complaint for Violations of Their Civil Rights and Breach of Employment Contracts **[Doc.**

**No. 26]**. The Court, having considered the motion, response, reply, relevant law, and being otherwise

fully informed, finds that the motion is well taken and will be **GRANTED, in part**, as explained

below.

## BACKGROUND

Plaintiff Fred Mares ("Mares"), the former Marshal for the Village of Melrose ("Melrose"),

and Plaintiff Charlie Garrett ("Garrett"), currently the Deputy Marshal for Melrose, raise claims of

racial discrimination, breach of contract, and uncompensated overtime against the Mayor, Ray Hester

("Hester"), the Mayor Pro Tem, Hoyt Clifton ("Clifton"), and the Village of Melrose.

1

## A.    Undisputed Material Facts

For the purpose of deciding this motion, the Court finds that the following are the undisputed facts, as disclosed by the record:[1]

1.    Plaintiff Mares is a Hispanic male with a Spanish surname.

2.    Plaintiff Garrett is a Caucasian male.

3.    The Melrose Village Council appointed Mares to the position of Village Marshal on May 28, 1995.

4.    The Council hired Garrett to the position of Deputy Marshal on or about March 1996. Garrett remains in that position to the present.

5.    Several citizens of Melrose objected to Mares' appointment as Marshal. Reasons cited include that Mares was a member of the Village Council which voted to terminate his predecessor, Mares was still on the Village Council when he pursued the appointment as Marshal, and the other candidate agreed to work for less money.

6.    Mayor Hester appointed a citizen committee to review and interview the applicants for the Marshal position. Mayor Hester selected the individuals to serve on this committee. The committee endorsed the other candidate and Mayor Hester followed suit, supporting the other candidate.

7.    The Village Council nevertheless appointed Mares to the position of Marshal. Mares thereupon resigned from the Village Council.

---

[1]The Court accepts as undisputed all facts admitted by both parties and all facts for which no competent contrary evidence has been presented by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Mere assertions that a fact is or is not controverted are insufficient. *Id.*

8.     Mayor Hester supervised Mares in his duties as Marshal.

9.     Throughout his tenure as Marshal, Mares made several requests for upgrades and improvements to the Marshal's office. These included increased office space, a new computer, a four-wheel drive vehicle, a home telephone line, and new uniforms. Mayor Hester approved all of these requests.

10.     When interviewing Garrett for the position of Deputy Marshal, Mayor Hester indicated that within a few years Garrett might be considered for Mares' position as Marshal.

11.     Mares supervised Garrett in his duties as Deputy Marshal.

12.     Garrett supported Mares' policies and decisions as Marshal.

13.     Mayor Hester has used the terms "wetback" and "nigger" in official and private conversations including at least one conversation with Mares.[2]

14.     Mares has used the terms "wetback" and "nigger" in official and private conversations.

15.     On one occasion, Mayor Pro Tem Clifton made a comment at a Village Council meeting to the effect that a "Mexican chain gang" was needed to complete certain physical work.

---

[2]Plaintiffs contend that Mayor Hester on one occasion specifically referred to Mares (outside of Mares presence) as a "fucking wetback." Plaintiffs have submitted only a hand-written, unsworn statement supporting this contention. This evidence is hearsay and cannot be considered by the Court on a summary judgment motion. *See* Fed.R.Civ.P. 56(e); *Jackson v. Griffith*, 480 F.2d 261, 268 (10th Cir.1973). Further, although Defendants state in their memorandums that Mayor Hester denies making any racially derogatory comments at all, they have not submitted deposition testimony nor an affidavit to that effect. The affidavits submitted from individuals who claim not to have heard Mayor Hester make racially derogatory comments do not refute the testimony attributing such comments to him on other occasions. Therefore, Plaintiffs' evidence of racially derogatory comments by Mayor Hester remains uncontroverted.

16.     On "several" occasions, citizens of Melrose brought verbal and written complaints to the Village Council and Mayor Hester about Mares' and Garrett's rude and inappropriate conduct in performing their duties.

17.     Mayor Hester and Village Council members spoke with Mares and Garrett regarding these complaints.

18.     Mayor Hester did not solicit the citizen complaints.[3]

19.     The Village of Melrose Personnel Policies and Procedures Manual creates a contract between the parties.

20.     The Village Personnel Policy provides that complaints regarding Village employees are to be made in writing to the Mayor and to be fully investigated by the Village Council. The Personnel Policy further permits the Mayor to verbally warn or advise employees regarding complaints. If disciplinary action is taken against the employee, such action is to be documented in writing, with the employees signature, and maintained in the employee's personnel file.

21.     On one occasion, Garrett was advised in writing regarding a complaint that his dog had bitten a citizen.

---

[3]Plaintiffs assert that on at least one occasion Mayor Hester "solicited" a complaint. Defendants have submitted an affidavit from Municipal Judge Richard Leon Burch regarding the incident at issue. Judge Burch states that a citizen appeared before him in a traffic matter and complained about how he was treated by Mares. Judge Burch requested that Mayor Hester come to the courtroom to hear the complaint. Mayor Hester advised the citizen that if he wished to pursue the issue he should reduce his complaint to writing and bring it before the Village Council. This does not amount to "soliciting" a complaint. Plaintiffs have presented no other competent evidence which would demonstrate that Mayor Hester ever "solicited" any of the "several" complaints received.

22.     The letter advising Garrett regarding the dog bite complaint was placed in Garrett's personnel file. Mares had the letter removed because Garrett had not been given an opportunity to sign the letter.

23.     One letter was placed in Mares' personnel file memorializing a conversation advising Mares that he was to keep the Village dispatcher informed as to his location at all times. Mares signed an acknowledgment of having received and reviewed the letter.

24.     Mayor Hester instructed Mares and Garrett to follow a city employee– who drove a city vehicle and was suspected of drinking and driving– and to stop and arrest the employee if he was driving under the influence.

25.     Mayor Hester spoke with Mares regarding a particular citizen, Steven Woods, whom Mayor Hester considered a problem.

26.     In the conversation regarding citizen Steven Woods, Mayor Hester asked Mares why he did not beat up Woods when Mares arrested him. Mares objected to this statement.

27.     Mayor Hester instructed Mares to arrest Garrett's son for driving without a license. When Mares advised Mayor Hester that the young man did have a license, Hester instructed him to arrest him for reckless driving. Mares states that Mayor Hester threatened to terminate him if he did not arrest the young man.

28.     When Garrett arrested Mayor Hester's nephew for bringing a BB-gun to school, Mayor Hester told Mares not to treat him any differently. Mares, however, perceived Hester's demeanor as "aggravated" over the manner in which the incident was handled.

29.     On May 28, 1997, an attorney for both Mares and Garrett sent a letter to the Village Council as a grievance regarding Mayor Hester's behavior towards them. This letter complained of Mayor Hester's use of racially derogatory language and his instructions to "target" particular citizens.

30.     Garrett did not specifically oppose Mayor Hester's racist conduct nor did he complain to the Village Council in any form regarding the alleged racial discrimination until the letter sent on Garrett's and Mares' behalf raised the issue of racial discrimination.

31.     On July 10, 1997, the Village Council removed Mayor Hester from supervising Mares and Garrett and placed Mayor Pro Tem, Hoyt Clifton, in that position.

32.     After Mayor Hester was removed from his position as supervising Plaintiffs, Mares and Garrett describe his behavior towards them as "professional." Elsewhere in their depositions, Mares and Garrett state that Hester "gave them the cold shoulder," and at one Village Council meeting, attempted to disrupt their presentations by "taping a pencil loudly," "shifting around his chair," and interrupting Mares when he was answering questions.

33.     In a private conversation (outside of Garrett's presence) and after having been removed from his role as supervisor, Mayor Hester referred to Garrett as a "fat bastard."

34.     As his supervisor, Clifton spoke with Mares regarding complaints which the Village Council continued to receive.

35.     Mares and Garrett describe Clifton's conduct towards them as professional.

36.     Mares and Garrett were treated equally with regard to their employment and any complaints brought by citizens of the village.

37.     Mares resigned from his position as Marshal on October 1, 1997.

38.     Since Mares' resignation, Garrett has not been appointed to the position of Marshal.

39.     The Village Marshall's office has less than five employees.

40.     The Village Council and Mayor Hester directed Mares and Garrett not to work overtime. Plaintiffs were advised that the Village could not afford to pay overtime due to budget constraints.

41.     The Village Personnel Policy provides for compensatory time off rather than overtime pay if requested within 30 days of accruing the overtime.

42.     Neither Mares nor Garrett officially requested compensatory time off within 30 days of accruing overtime.

43.     Mayor Hester verbally instructed Mares and Garrett to answer all emergency calls, no matter when received.

44.     Clifton verbally indicated to Mares and Garrett that they would be paid for their overtime since compensatory time for one resulted in additional overtime for the other.

45.     Clifton and Mayor Hester "verbally waived" the 30 time limit for requesting compensatory time.

46.     Mares did take time off which was not deducted as vacation or sick leave.

47.     The Melrose Personnel Policy provides that just cause for termination includes the following: interfering, meddling, harassing, obstructing, disrupting, tampering, interceding with a Village employee or Village official; participating in frivolous gossip or false accusation about Village employees or Village officials; interfering with the authority or normal process of another Village employee's or official's job or function; engaging in discourteous, offensive, or abusive activity to the public or to fellow employees or Village officials; participating in any activity which may result in lower morale by the Village employees; and engaging in antisocial behavior.

**B.    Contested Issues Between the Parties**

The remaining contested issues between the parties essentially revolve around how to characterize many of the events described above, as follows:

1.    Mares asserts that Mayor Hester opposed his appointment as Marshal from the outset; that Mayor Hester selected individuals to serve on the citizen advisory committee who would do his bidding; and that the opposition of the Mayor and the citizen committee to Mares' appointment undermined his authority.

2.    The parties dispute the nature of the conversations between them regarding the citizen complaints received about Mares' and Garrett's conduct. Defendants characterize these conversations as "informing and counseling" Plaintiffs. Plaintiffs describe these conversations as "confronting and accusing them." Plaintiffs assert that both Mayor Hester and Mayor Pro Tem Clifton "confronted and accused them" without providing written documentation of the complaints. Neither party has presented competent evidence of the content of the conversations but merely rely on these characterizations.

3.    Similarly, the parties dispute whether any disciplinary action was taken against Plaintiffs as a result of the complaints. Mares and Garrett state that they were verbally reprimanded several times and that one letter was placed in Garrett's personnel file. Defendants deny that these steps constituted disciplinary actions.

4.    Plaintiffs state that Mayor Hester "instructed them to target innocent citizens." Defendants assert that the Mayor brought to the Plaintiffs' attention "genuine" law enforcement issues.  Mares and Garrett do not specifically assert that they refused to comply with the Mayor's order, except as described in the undisputed facts above.

# STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case."*Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

# ANALYSIS

Plaintiffs' Complaint raises the following five claims: count (1) racial discrimination pursuant to 42 U.S.C. § 1981 as to Plaintiff Mares; count (2) racial discrimination pursuant to 42 U.S.C. § 1981 as to Plaintiff Garrett; count (3) racial discrimination pursuant to 42 U.S.C. § 1983 as to both Plaintiffs; count (4) breach of contract for discrimination and harassment as to both Plaintiffs; and count (5) breach of contract for failure to pay overtime as to both Plaintiffs. Grouping these claims based on the operative facts underlying them, the Court will first address the claims of racial discrimination by Plaintiff Mares and then those of Plaintiff Garrett. The Court will then turn to the breach of contract claims for both Plaintiffs. Finding that Plaintiffs have failed to produce sufficient evidence to support any of the asserted causes of action with the exception of a single breach of contract claim, the Court will dismiss counts 1, 2, 3 and 5 of the Complaint with prejudice.

## 1.     Mares' § 1981 and § 1983 Claims

Mares presses claims of racial discrimination pursuant to both 42 U.S.C. § 1981 and § 1983. Because these claims are based on the same set of facts and employ the same standards, the Court will analyze these claims together.

Section 1981 states that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. Section 1981 provides a private right of action for racial or sexual discrimination in both private and public employment. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975).

Section 1983 states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

42 U.S.C. § 1983. Section 1983 likewise provides a private right of action against a public employer who violates an employees constitutional rights, including the right not to be discriminated against on the basis of race, as guaranteed by the Fourteenth Amendment. *Ryan v. City of Shawnee*, 13 F.3d 345, 349-50 (10th Cir.1993); *Woodward v. Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992) Woodward, 977 F.2d at 1397; *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir.1989).

As a basic element of a claim of employment discrimination pursuant to both Section 1981 and Section 1983, the plaintiff-employee must articulate how they have been discriminated against: the employee must define the actual harm experienced by him on account of his race. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Jeffries v. Kansas*, 147 F.3d 1220, 1231 (10th Cir. 1998). A mere allegation of prejudice or racial animosity, even by a supervisor, is legally insufficient. It is only to the extent that prejudice has been acted on to the employee's detriment that an employee may pursue claims of racial discrimination. *See Bailey v. Binyon*, 583 F.Supp. 923, 927 (E.D. Ill. 1984) (recognizing distinction between evidence of discrimination and evidence of discrimination that is actionable under Title VII or Section 1981). An employee may however pursue an action for discrimination under both Section 1981 and Section 1983 on theories of constructive

discharge and/or maintenance of a racially hostile work environment. *See Woodward*, 977 F.2d at 1397-1401.

In the present case, Mares' Complaint pleads facts which, if true and supported by competent evidence, would demonstrate constructive discharge and/or a racially hostile environment. The question, thus, is whether Plaintiffs have produced sufficient evidence to rebut Defendants assertion that they cannot prove these claims as a matter of law. After reviewing the evidence presented, the Court concludes that Plaintiffs have failed to produce sufficient evidence that Mares was subjected to a racially hostile work environment or constructively discharged to support his Section 1981 and Section 1983 claims, as described below.[4]

a.    Hostile Environment Claim

As the Tenth Circuit recently stated:

[f]or a hostile environment claim to survive a summary judgment motion, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Service*, 142 F.3d 1334, 1341 (10th Cir.1998) (internal quotation marks and citations omitted). The plaintiff must produce evidence that she was the object of harassment because of her gender [or race]. . . .

While the plaintiff must make a showing that the environment was both objectively and subjectively hostile, she need not demonstrate psychological harm, nor is she required to show that her work suffered as a result of the harassment. *See Davis*, 142 F.3d at 1341.

---

[4]The parties spend considerable energy discussing the the standards and burden of proof in proving a claim of disparate treatment in employment pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). As with any claim for discrimination, a claim of disparate treatment requires first a showing that the plaintiff has suffered an actionable harm, usually failure to hire or promote or discharge. *Id*. Constructive discharge is the legal equivalent of discharge in this equation. *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 925 (5th Cir.1982). Since the Court concludes that the Plaintiffs have here failed to prove constructive discharge as an initial matter, the Court need not apply the *McDonnell* analysis to the facts before it.

*Penry v. Fed. Home Loan Bank of Topeka*, __ F.3d __, 1998 WL 614412, *2 (10th Cir. Sept. 15, 1998); *see also Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1418 (10th Cir.1993) ("To prevail under a hostile work environment theory, the plaintiff must show that . . . conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)).[5]

In assessing a hostile environment claim, "the district court [is] to examine the totality of the circumstances when reviewing a summary judgment motion." *Id.* at *3 (citing *Davis*, 142 F.3d at 1341; *Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir.1997)). The Court is not limited to only discriminatory acts specifically directed at the plaintiff but may consider the entire working environment to which the plaintiff was subjected. *Id.* "[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere therefore--as well as evidence of specific hostility directed toward the plaintiff--is an important factor in evaluating the claim." *Id.* (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987)). Applying this standard, the Tenth Circuit in *Penry* concluded that the plaintiffs, in proving their claims of a sexually hostile work environment, could rely on two incidents which although not directly derogatory towards them were nonetheless "gender-related." This included a supervisor

---

[5]The Tenth Circuit has not specifically ruled on what standard to use in analyzing hostile environment claims brought under Section 1983. *See Redpath v. Overland Park*, 857 F.Supp. 1448, 1460-62 (D. Kan. 1994). This Court agrees with *Redpath*, however, that the standard ultimately articulated will be at least as exacting as the standard used in Title VII and Section 1981 cases, cited in the body of this Opinion.

taking one of the women to lunch at Hooters restaurant and his comment that the roof of the mall "looked like women's breasts." *Id.* at *4-5.

However, the *Penry* Court otherwise agreed with the district court that only those acts which were clearly "gender related" or "based on gender" should be considered in determining whether sufficient evidence of a hostile environment has been presented to survive a motion for summary judgment. *Id.* Neither Section 1981 nor Section 1983 protect an employee from a generally unpleasant work environment; it is only negative or derogatory actions based on the plaintiff's race or gender which are actionable and which the Court therefore may consider. *Penry*, 1998 WL 614412, *5 ("If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." Quoting *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir.1994)); *Arzate v. Topeka*, 884 F.Supp. 1494, 1502 (D. Kan. 1995).

Accordingly, in proving the claim of a racially hostile environment in the case currently before the Court, Plaintiffs may rely on all acts or incidents which were in some sense "race-related" or "based on race" regardless of whether those actions were specifically directed at them. Plaintiffs may not however employ any facts or incidents which, although unpleasant or evidencing tension between the parties, are not "based on race." Plaintiffs' mere allegation that an action is "race-related," in the absence of evidence demonstrating a solid connection to race or racial animosity, is not sufficient. *Penry*, 1998 WL 614412, *5.

Plaintiffs' Complaint lists the following facts as establishing a racially hostile work environment:

1.    Before the appointment of Plaintiff Fred Mares, Defendant Ray Hester assisted in or encouraged the formation of a Board of Concerned Citizens to protest the appointment of Plaintiff Fred Mares. ¶ a

2.    On one or more occasions during this period, Defendant Ray Hester has in a public place, in the presence of others, referred to Plaintiff Fred Mares as a "fucking little wetback." ¶ b

3.    On one or more occasions, Defendant Ray Hester has referred to persons in the presence of Plaintiff Fred Mares as a "wetback," "nigger," "fucking nigger" and has used the term "Mexican drag line." ¶ c

4.    On or about March or April 1996, Defendant Ray Hester told Plaintiff Charlie Garrett, who is Caucasian, that he (Charlie Garrett) would have Plaintiff Fred Mares' job within six months. ¶ d

5.    On one or more occasions, Defendant Ray Hester has solicited complaints against Plaintiff Fred Mares relating to his job performance, Defendant Ray Hester and Defendant Hoyt Clifton have used the complaints to threaten Plaintiff Fred Mares but never provided Plaintiff Fred Mares with a written complaint in which to respond or rebut. ¶ e

6.    On one or more occasions in open council meetings, Defendant Ray Hester has threatened to fire Plaintiff Fred Mares for refusing or failing to target citizens of Melrose selected by the Mayor or for refusing to give preferential treatment to certain members of the community, including members of the Mayor's family. ¶ f

7.    On one or more occasions, Defendant Ray Hester has made derogatory and demeaning comments about Plaintiff Fred Mares to undermine his authority in the community. ¶ g

With a single exception, Plaintiffs have failed to produce competent evidence proving the facts alleged above or demonstrating that the events were in any way race related. As to point (1), Plaintiffs failed to produce any evidence that Mayor Hester organized the citizen review committee specifically for the purpose of opposing Mares' appointment, rather than as a legitimate attempt to involve concerned citizens in the selection process, and failed to provide any evidence that even if this had occurred that this was an action based on race. As to point (2), Plaintiffs failed to provide competent

evidence that Mayor Hester made a derogatory remark specifically in reference to Mares. As to point (4), the evidence shows that Mayor Hester told Garrett he might be considered for Mares' job in a few years, not in six months. As to point (5), Plaintiffs failed to produce any evidence that Mayor Hester "solicited" complaints and have failed to demonstrate that Defendants' conversations with Plaintiffs regarding the complaints were in anyway "race-related." As to point (6) Plaintiffs failed to produce any evidence that Mayor Hester, in a council meeting, threatened to fire them for refusing to target certain citizens and, even if he did, Plaintiffs' own complaint refutes the inference that he did so "based on race" rather than based on their refusal to follow his inappropriate orders. Finally, as to point (7), again, Plaintiffs failed to produce competent evidence of derogatory comments made by Mayor Hester regarding Mares.

The Court is left with the uncontested fact that Mayor Hester used racial slurs in official and private conversations including at least one conversation with Mares. Depending on the frequency and severity, this alone could support the conclusion that Mares was subject to a racially hostile environment. *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.'); *see also Vigil v. Las Cruces*, 119 F.3d 871, 874 (10th Cir. 1997) (Lucero, J., dissenting from failure to grant en banc review, discussing cases in which courts have found use of racial slurs sufficiently egregious to support racial discrimination suit); *Bailey*, 583 F.Supp. at 927 ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se."). As the Supreme Court of Washington aptly stated, "[a]s we as a nation of immigrants become more aware of the need for pride in our diverse

backgrounds, racial epithets which were once part of common usage may not now be looked upon as 'mere insulting language.'" *Bailey*, 583 F.Supp. at 932 (quoting *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 656 P.2d 1173, 1177 (1977)). "Such comments are different qualitatively because they conjure up the entire history of racial discrimination in this country." *Id*. at 934 (quotation marks and citation removed). "The term 'wetback' is severely degrading. . . . Accordingly, its use hardly needs to be pervasive for a Hispanic employee to find her work environment hostile and abusive--and reasonably so." *Vigil*, 119 F.3d at 874 (Lucero, J., dissenting, citations and parentheticals omitted).

The difficulty here, however, is that Plaintiff Mares has himself admitted to repeatedly using the very same offense terms in both official and private conversations with numerous Village employees. The facts demonstrate that Mares did not simply use these terms when conversing with Mayor Hester in some effort to appease or not challenge his supervisor; rather Mares testified to using these terms in conversations with several other Village employees. Plaintiff's explanation that he referred to people he arrested and community citizens as "wetbacks" or "niggers" only for "clarity" is hollow and itself offensive. Indeed, the image painted here, of the Mayor, Village Marshal and other Village employees using racial slurs in official and private conversations, is deeply disturbing.

The relevance of Mares' own use of racially offensive language in the work place is that it completely undermines his assertion that Mayor Hester's use of such language, alone, subjectively caused him such harm as to "alter the conditions of [his] employment and create an abusive working environment." *Penry*, 1998 WL 614412 *2; *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924 (5th Cir.1982) (plaintiff's own use of racial epithets undermined his claim that he found such language so offensive as to constitute an abusive working environment). Mares has failed to produce any evidence

that he was subjected to a racially hostile environment other than the offensive language used by the Mayor, language which Mares has failed to prove was specifically directed at him in a hostile manner. No reasonable jury could conclude that Mares was so deeply offended solely by Mayor Hester's language that Mares experienced his work environment as abusive when he himself subjected his co-workers to the same treatment. Absent evidence that a reasonable person *in the plaintiff's position* would have experienced the work environment as hostile and abusive, Plaintiff Mares cannot succeed on his claims. *See Arzate*, 884 F.Supp. at 1503.

Because Plaintiffs have failed to rebut Defendants' assertion that they cannot produce sufficient evidence to demonstrate a racially hostile work environment, Defendants are entitled to judgment as a matter of law on that aspect of Plaintiff Mares' Section 1981 and Section 1983 claims. *Penry*, 1998 WL 614412, *5.

b.      Constructive Discharge

In order to establish constructive discharge, "the plaintiff 'must produce evidence that the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.'" *Penry*, 1998 WL 614412, *6 (quoting *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1514 (10th Cir.) (citations and internal quotation marks omitted), cert. denied, --- U.S. ----, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997)); *see also Woodward*, 977 F.2d at 1401 (employing same standard in Section 1983 case). "Essentially, a plaintiff must show that she had 'no other choice but to quit.'" *Jeffries*, 147 F.3d at 1233 (quoting *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997) and *Woodward*, 977 F.2d at 1401).

In the present case, Mares relies on the same facts detailed above to support his claim of constructive discharge. Again, the only fact which has been proven with competent evidence is that Mayor Hester used racially offensive language. For the reasons noted above, viewing the record in the light most favorable to the Plaintiff, this fact alone is insufficient to demonstrate that "a reasonable person in [Mares] position would feel compelled to resign." *See also Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir.1982). Therefore, Defendants are entitled to judgment as a matter of law on that aspect of Plaintiff Mares' Section 1981 and Section 1983 claims based on constructive discharge as well.

## 2. Garrett's Section 1981 and Section 1983 Claims

Plaintiff Garrett is white. His claims of discrimination pursuant to Section 1981 and Section 1983 are premised on his opposition to racially discriminatory conduct in the work place. Specifically, Garrett asserts that in retaliation for his "support of a Hispanic employee and opposition to racial discrimination against Plaintiff Fred Mares," Plaintiff Garrett was subjected to a "hostile work environment" and was not promoted to the position of Marshal. Complaint ¶¶ 27, 36-37.

White employees can pursue claims of discrimination pursuant to Section 1981 and Section 1983 based on retaliation for their opposition to discriminatory conduct. *Price v. Federal Express Corp.,* 660 F.Supp. 1388, 1391 (D.Col. 1987). "A white plaintiff may file a retaliation claim under 42 U.S.C. § 1981 or § 1982 where the white plaintiff objects to what he or she believed to be racially discriminatory conduct against a non- white person. *Sullivan v. Little Hunt Park*, 396 U.S. 229, 237, 90 S.Ct. 400, 404-05, 24 L.Ed.2d 386 (1969) (a community recreational corporation cannot legally expel a white member for advocating the cause of a Black seeking membership; the expelled member has standing to sue under 42 U.S.C. § 1982)." *Id.*; *see also Mozee v. Amer. Commer. Marine Service*

*Co.*, 940 F.2d 1036, 1054 (7th Cir. 1991)(discussing cases in which white plaintiffs brought claims of discrimination for retaliation for objecting to discrimination pursuant to Sections 1981 and 1983).

The Tenth Circuit has articulated the standard and burden of proof to be applied in cases alleging discriminatory retaliation as follows:

> a plaintiff must first establish a *prima facie* case of retaliation. If a *prima facie* case is established, then the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action. If evidence of a legitimate reason is produced, the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination. The overall burden of persuasion remains on the plaintiff.

*Jeffries,* 147 F.3d at 1231 (quoting *Sorensen v. City of Aurora*, 984 F.2d 349, 353 (10th Cir.1993)); *see also Penry*, 1998 WL 614412, *5. In order to make out a *prima facie* case of retaliation, a plaintiff must prove: "(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer; and (3) a causal connection between the protected activity and the adverse action." *Jeffries,* 147 F.3d at 1231; *see also Penry*, 1998 WL 614412, *5.

Thus, no individual, no matter what race, may pursue a claim of retaliation based on opposition to racial discrimination pursuant to Sections 1981 and 1983 absent evidence that the employee actually took action in opposition to the alleged discriminatory conduct. *Jeffries,* 147 F.3d at 1231; *Price,* 660 F.Supp. at 1391. Unspoken or even implicit disapproval of his or her employer's conduct in insufficient.

In the present case, Garrett attempts to premise his claims of retaliation on his "support" for Plaintiff Mares and ultimately on a demand letter sent by Garrett and Mares to the Village Council. Garrett's mere "support" for Plaintiff Mares' policies and decisions when Mares' was Garrett's

supervisor is insufficient to establish a protected act of opposition to Mayor Hester's racial discrimination. *Jeffries,* 147 F.3d at 1231; *Price,* 660 F.Supp. at 1391. The demand letter sent by Mares' and Garrett's attorney, on the other hand, sufficiently connects Garrett to Mares' claim of racial discrimination to support Garrett's asserted retaliation claim. Thus, Garrett has established the first prong of a *prima facie* case. As to the second prong, adverse action by the employer, Garrett asserts that he was (1) subject to a hostile work environment, and (2) not promoted. The Court will address these claims in turn.

a.      Hostile Environment Claim

The Court is unaware of any other case in which a white plaintiff has asserted a claim of "hostile environment" based on retaliation for opposition to racially discriminatory behavior. Assuming without deciding that such a claim is theoretically possible, the Court will apply the same standards described above. Plaintiff Garrett must, therefore, produce competent evidence that he was subjected to hostile acts based on his opposition to racial discrimination in the work force, such that he did and a reasonable person would experience the working environment as abusive. *Penry*, 1998 WL 614412, *2. In proving this claim, Garrett may only make use of those acts which were in some sense "based on" his opposition to Mayor Hester's conduct. *Id.* at 4-5.

Garrett premises his hostile environment claim on the following acts:

a.      On one or more occasions, Defendant Ray Hester has solicited complaints against Plaintiff Charlie Garrett relating to his job performance, Defendant Ray Hester and Defendant Hoyt Clifton have used the complaints to threaten Plaintiff Charlie Garrett but never provided Plaintiff Charlie Garrett with a written complaint in which to respond or rebut. ¶ a

b.      On one or more occasions in open council meetings, Defendant Ray Hester has threatened to fire Plaintiff Charlie Garrett for refusing or failing to target citizens of

Melrose selected by the Mayor or for refusing to give preferential treatment to certain members of the community, including members of the Mayor's family. ¶ b

c.  On one or more occasions, Defendant Ray Hester has referred to persons in the presence of Plaintiff Fred Mares as a "wetback," "nigger," "fucking nigger" and has used the term "Mexican drag line." ¶ c

d.  On or about April 1996, Defendant Ray Hester threatened to fire Plaintiff Charlie Garrett and placed a letter of reprimand in Plaintiff Charlie Garrett's personnel file without his knowledge for an unsubstantiated allegation that his dog had bitten a woman. ¶ d

e.  On one or more occasions, Defendant Ray Hester made loud outbursts in public places regarding Plaintiff Charlie Garrett such as "I can't believe that son of a bitch is going to stop him [a motorist] here," which ridiculed Plaintiff and undermined his authority in the community. ¶ e

f.  Since the constructive discharge of Plaintiff Fred Mares, Defendants have refused to appoint Plaintiff Charlie Garrett Marshall [sic] or Temporary Marshall [sic], leaving Plaintiff Charlie Garrett without legal authority to operate and forcing Plaintiff Charlie Garrett to seek assistance from outside law enforcement agencies to enable him to perform his duties. ¶ f

As with Plaintiff Mares, there is simply a failure of proof as to most of the asserted acts and no competent evidence that the events which did occur were in any way related to Garrett's opposition to Mayor Hester's conduct. As to point (1) Plaintiffs failed to prove that Mayor Hester solicited complaints against them and Plaintiff Garrett has presented no evidence that the handling of the complaints was influenced by his opposition to Mayor Hester's behavior. Indeed, Plaintiffs assert that they were "confronted" with these complaints both before and after the demand letter which marks the beginning of Garrett's opposition, thereby disproving the contention that the complaints were handled in a manner intended to retaliate for Garrett's opposition to Mayor Hester's behavior. As to point (2), Plaintiffs failed to prove that they were threatened in open council meetings and again, the circumstances of the alleged threats demonstrate that they were not based on Garrett's

opposition to Mayor Hester's racism. As to point (3) the conduct alleged precedes Garrett's oppositional act and there is no evidence that Mayor Hester's use of racial slurs was in any way a response to Garrett's opposition. As to point (4), again, the conduct proceeds the oppositional act and there is no evidence linking the reprimand over the dog bite to Garrett's opposition.

As to point (5), Plaintiffs have presented competent evidence that Mayor Hester publicly insulted Garrett, after Garrett's oppositional act. Plaintiffs, however, failed to present any evidence connecting this insult to Garrett's opposition. The insult, on its face, has no relation to Garrett's stance opposing Mayor Hester's discriminatory acts. As noted above, rude, inappropriate behavior is not prohibited by either Section 1981 or Section 1983. *Penry*, 1998 WL 614412, *5. In assessing a hostile environment claim, the Court is limited to considering those acts which are in some sense based on race, or in this case, based on Garrett's opposition to discrimination. *Id.* at 4-5. Plaintiffs have failed to demonstrate that the statement attributed to Mayor Hester was based on Garrett's protected conduct.

Finally, as to point (6), the Court fails to see how the failure to promote Garrett could be recast as an act creating a hostile work environment. Rather, the Court will consider this fact as a separate component of Garrett's retaliation claim.

Because Plaintiffs failed to present any competent evidence at all demonstrating that Plaintiff Garrett was subject to a hostile work environment because of his protected opposition to Mayor Hester's discriminatory conduct, Defendants are entitled to judgment as a matter of law as to this aspect of Garrett's Section 1981 and Section 1983 claims. *Penry*, 1998 WL 614412, *6.

b.      Failure to Promote

Plaintiff Garrett's more substantive claim is that the failure to promote him to the position of Marshal was an act of retaliation for his protected opposition to Mayor Hester's discriminatory conduct. As noted above, Plaintiff bears the initial burden of demonstrating a *prima facie* case of retaliation by proving: "(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer; and (3) a causal connection between the protected activity and the adverse action." *Jeffries,* 147 F.3d at 1231. Once a *prima facie* showing has been made, the burden shifts to Defendants to articulate a nondiscriminatory reason for the action taken. *Id.* If a nondiscriminatory reason is given, Plaintiff then bears the burden of rebutting this assertion. *Id.*

In the present case, Garrett has demonstrated a protected act of opposition to discrimination and an adverse action by his employer, that being the failure to promote him, even temporarily, to the position of Marshal. However, Plaintiff has provided no evidence that this action was causally connected to his protected activity. *See Redpath v. Overland Park*, 857 F.Supp. 1448, 1459 (D. Kan. 1994) (no evidence disciplinary actions based on improper, retaliatory motive). Indeed, following Plaintiff Garrett and Mares' letter complaining about Mayor Hester's racially discriminatory conduct, the Village Council removed Mayor Hester from the role of supervisor for Plaintiffs and placed Mayor Pro Tem Clifton in that position. Both Plaintiffs, by their own testimony, describe Clifton's behavior towards them as professional. Plaintiff has not plead or proven that he was otherwise qualified for the position of Marshal nor that anyone else, equally or less qualified, has been given the position. There is simply insufficient evidence to demonstrate a connection between Plaintiff's protected act and the failure to promote. *Redpath*, 857 F.Supp. at 1459. The Court concludes

therefore, that Plaintiff has failed to prove a *prima facie* case that the failure to promote him was an act of retaliation for his protected conduct.

Even assuming arguendo that Plaintiff Garrett has established a *prima facie* case, Defendants have proffered a nondiscriminatory reason for the failure to promote Garrett: the "several" citizen complaints regarding his rude and inappropriate behavior as Deputy Marshal. Garrett has presented no evidence which would support a finding that the proffered reason is pretextual. *See Durham v. Xerox Corp.*, 18 F.3d 836, 840 (10th Cir. 1994); *Redpath*, 857 F.Supp. at 1460. Particularly given that the complaints predate Garrett's act of opposition, that the Village Council promptly responded to Plaintiffs' complaint regarding Mayor Hester's behavior, and that Plaintiffs have offered no evidence that a less qualified candidate has been given the job, Plaintiffs have failed to make even the most minimal showing of pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. at 804-805 (facts relevant to showing pretext include how plaintiff was treated prior to protected act and employer's response to opposition to discrimination). Plaintiff Garrett has therefore failed to meet the minimum threshold required to prove his claim.

Because Plaintiffs have failed to produce any evidence demonstrating a causal connection between Garrett's act of opposition and the failure to promote him and have failed to produce any evidence which would rebut the nondiscriminatory reasons proffered by Defendants (and amply supported by the record), Defendants are entitled to judgment as a matter of law as to that part of Garrett's Section 1981 and Section 1983 claims based on the failure to promote him.[6] *Durham*, 18 F.3d at 840; *Redpath*, 857 F.Supp. at 1460.

---

[6]Because the Court concludes that Plaintiffs have failed to prove any violation of their constitutional rights, the Court need not address Defendants' argument that they are immune from liability pursuant to Section 1983. *See Woodward*, 977 F.2d at 1398.

Accordingly, because Plaintiffs have failed to produce sufficient evidence of racial discrimination, counts 1, 2 and 3 of the Complaint will be dismissed.

**3.  Breach of Contract**

Plaintiffs' fourth count asserts that Defendants breached their employment contract with Plaintiffs by subjecting Plaintiffs to "discrimination and harassment." The parties agree that the Melrose Village Personnel Policy creates an implied employment contract between them.

The Village Personnel Policy specifically provides the following:

1.  "Any complaint regarding a Village employee will be addressed to the Mayor in written form. The complaint will be fully investigated by the Mayor and Village Council." § 601

2.  Employees may be orally reprimanded; "however, any such warning will be documented." § 602

3.  "A record of any disciplinary action taken will be made in written form and maintained in the employee's permanent file, stating the cause for discipline and citing the specific elements upon which it is based. . . . A copy of the action will be given to the employee at the time of the action, and the employee will sign an acknowledgment of receipt of a copy of the action." §608

4.  "Any of the following are declared to be special cause for prompt dismissal:

    interfering, meddling, harassing, obstructing, disrupting, tampering, or interceding with a Village employee or Village official;

    participating in frivolous gossip or false accusation about Village employees or Village officials, past and present;

    interfering with the authority or normal process of another Village employee's or official's job or function; . . .

    engaging in discourteous, offensive, or abusive activity to the public or to fellow employees or Village officials . . .;

    any activity which may reasonably be expected to result in lower morale by the Village employees . . . ;

[and] antisocial behavior." § 514

Plaintiffs assert that Defendants breached these terms by subjecting them to racial discrimination and/or retaliation for opposition to discriminatory conduct; by "harassing" them in violation of the "code of conduct" contained in the Personnel Policy; and by disciplining them with unsubstantied citizen complaints.

To the extent that Plaintiffs premise their breach of contract claim on racial discrimination and/or retaliation, their claim must fail for the reasons stated above. Further, to the extent that Plaintiffs base their claim on violations of the "code of conduct" contained in the Personnel Policy, their claim must fail by the very terms of the contract. The Personnel Policy states that the listed grounds are deemed just cause for dismissal of the employee; nothing in the Personnel Policy guarantees to an employee a work place free of such behavior. To state that the employer may fire an employee for certain conduct is in no sense the same as stating that the employee has a right-- to be guaranteed and enforced by his employer-- to a work place free of such conduct. Because the cited language in the contract does not provide the rights which Plaintiffs here seek to enforce, this aspect of their claim must fail.

The Court is left with the assertion that Defendants breached the contract by (1) "confronting and threatening" Plaintiffs with citizen complaints which had not been reduced to writing; (2) orally reprimanding Plaintiffs based on these complaints without making a proper record of the disciplinary action; and (3) placing a letter of reprimand in Garrett's personnel file without providing him an opportunity to respond to or sign the letter.

Defendants acknowledge "counseling" Plaintiffs regarding oral citizen complaints. Defendants however assert that this "counseling" did not constitute a disciplinary action.

27

Defendants make no response regarding the letter of reprimand allegedly placed in Garrett's file. There is thus a genuine issue as to these material facts.

Moreover, viewing the record in the light most favorable to Plaintiffs, Defendants are not entitled to judgment as a matter of law. Accepting Plaintiffs' pled facts as true, Defendants took disciplinary action against both Garrett and Mares based on oral citizen complaints. Defendants were entitled to "advise or counsel" Plaintiffs on these complaints, or alternatively, to reprimand Plaintiffs verbally or in writing based on written complaints, if such reprimands were properly documented. However, under the terms of the employment contract, Defendants were not entitled to verbally reprimand Plaintiffs based on oral complaints and then fail to document those complaints or the disciplinary actions. Likewise, Defendants were not entitled to place a letter of reprimand in Garrett's personnel files without first providing that letter to him for signature.

Plaintiffs therefore have produced sufficient evidence to demonstrate a genuine issue of material fact as to whether Defendants breached their employment contract by verbally reprimanding them and by placing an unacknowledged letter of reprimand in Garrett's personnel file.[7] Accordingly, summary judgment on count 4 is inappropriate.

**4.    Overtime**

---

[7]Although Plaintiffs have failed to plead how they were damaged by this alleged breach, the law presumes damage as a result of a contract breach. Restatement, Contracts 2d § 346; 22 Am. Jur. 2d Damages § 17 (1988). Thus, Plaintiffs are entitled to prove at trial that they suffered some economic harm as a result of the alleged disciplinary actions taken. However, the Court notes that the record is currently devoid of any such evidence. Further, in the absence of evidence of economic harm, Plaintiffs will only be entitled to a jury instruction on nominal damages at trial. *See Stevens v. Mitchell*, 51 N.M. 411, 186 P.2d 386 (1947).

Finally, Plaintiffs press a breach of contract claim for failure to pay overtime, again based on the Village Personnel Policy. The Personnel Policy specifically provides for compensatory time off rather than overtime pay if requested within 30 days of the accrual of overtime hours. Plaintiffs do not dispute that they failed to request compensatory time off within the 30 day time limit. Plaintiffs contend however that Mayor Hester and Mayor Pro Tem Clifton verbally waived the 30 day requirement and verbally agreed to pay them for their overtime hours.

As Defendants correctly point out, Plaintiffs' argument is foreclosed by the case of *Trujillo v. Gonzalez*, 106 N.M. 620, 747 P.2d 915 (1987). The plaintiff in *Trujillo* sought to enforce a two year contract for employment with a local municipality. The agreement, however, was never reduced to writing or approved of by the city commission, but only orally assented two by two city commissioners acting alone. Such a contract, the *Trujillo* court held, is barred from enforcement by § 37-1-23, N.M.S.A. 1978 which states "[g]overnmental entities are granted immunity from actions based on contract, except actions based on a valid written contract." *Id*. at 916. As the court explained, "oral expressions are legally significant only if they are not contradictory and have some effect upon interpretation, application and legal operation of the written portion." *Id*. As in *Trujillo*, the oral terms asserted here are directly contradictory to the written contract and therefore can be given no effect.

Moreover, the *Trujillo* court held that the two city commissioners, acting alone, had no authority to bind the municipality to the contract. *Id*. at 916-17.

> NMSA 1978, Section 10-15-3 provides that no action of any commission or other policy- making body shall be valid unless it is taken or made at a meeting held in accordance with the Open Meetings Act. See NMSA 1978, §§ 10-15-1 to 10-15-4 (Repl.Pamp.1983). Although Section 10-15-1(E)(2) does provide for

privately-held discussions concerning personnel matters, that Subsection requires a public meeting for final actions on personnel matters.

*Id.*; *see also* NMSA 1978, Section 4-38-1 (Repl.Pamp.1984) ("[t]he powers of a county as a body politic and corporate shall be exercised by a board of county commissioners"). Because the two commissioners, acting alone, had no authority to contract on behalf of the city, the municipality was not bound by the contract, even if entered into in good faith. *Trujillo*, 747 P.2d at 916-17. Likewise, in the present case, the Mayor and Mayor Pro Tem could not bind the municipality to a contract to pay Plaintiffs overtime. Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiffs' claim for breach of contract for failure to pay overtime.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment on Plaintiffs' Complaint for Violations of Their Civil Rights and Breach of Employment Contracts **[Doc. No. 26]** is hereby **GRANTED, in part.** Counts 1, 2, 3, and 5 of Plaintiffs' Complaint are hereby **DISMISSED WITH PREJUDICE**. Count 4 remains properly before the Court.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Attorney for Plaintiffs:          Attorneys for Defendants:
   Jill Henson                        Marcia Lubar